IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

ARIZONA CHAMBER OF COMMERCE & INDUSTRY, AN ARIZONA NON-PROFIT
CORPORATION; THE GREATER PHOENIX CHAMBER OF COMMERCE, AN
ARIZONA NON-PROFIT CORPORATION; THE TUCSON HISPANIC CHAMBER OF
COMMERCE, AN ARIZONA NON-PROFIT CORPORATION; THE GREATER
FLAGSTAFF CHAMBER OF COMMERCE, AN ARIZONA NON-PROFIT
CORPORATION; AND THE ARIZONA LICENSED BEVERAGE ASSOCIATION, AN
ARIZONA NON-PROFIT ORGANIZATION; ARIZONA RESTAURANT
ASSOCIATION, AN ARIZONA NON-PROFIT CORPORATION; THE YUMA
COUNTY CHAMBER OF COMMERCE, AN ARIZONA NON-PROFIT
CORPORATION; MARC COMMUNITY RESOURCES, INC., AN ARIZONA NON-
PROFIT CORPORATION; THE ARIZONA FREE ENTERPRISE CLUB, AN ARIZONA
NON-PROFIT ORGANIZATION; AND **ABRIO** FAMILY SERVICES AND
SUPPORTS, INC., AN ARIZONA CORPORATION,
*Plaintiffs/Petitioners,*

*v.*

HONORABLE DANIEL J. KILEY, JUDGE OF THE SUPERIOR COURT OF THE
STATE OF ARIZONA, IN AND FOR THE COUNTY OF MARICOPA,
*Respondent Judge,*

STATE OF ARIZONA; INDUSTRIAL COMMISSION OF ARIZONA, A PUBLIC
ENTITY; ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM, A PUBLIC
ENTITY; THOMAS J. BETLACH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
THE ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM; ARIZONA
DEPARTMENT OF ADMINISTRATION, A PUBLIC ENTITY; CRAIG C. BROWN, IN
HIS OFFICIAL CAPACITY AS THE DIRECTOR OF THE ARIZONA DEPARTMENT OF
ADMINISTRATION,
*Defendants/Real Parties in Interest,*

*and*

ARIZONANS FOR FAIR WAGES AND HEALTHY FAMILIES SUPPORTING
PROP 206,
*Intervenor–Defendant/Real Party in Interest.*

---

No. CV–16–0314–SA
Filed August 2, 2017

_____

Special Action from the Superior Court in Maricopa County
The Honorable Daniel J. Kiley, Judge
No. CV2016–018092

**PETITION GRANTED; RELIEF DENIED**

COUNSEL:

Brett W. Johnson (argued), Sara J. Agne, Snell & Wilmer, L.L.P., Phoenix;
Attorneys for Arizona Chamber of Commerce & Industry, the Greater
Phoenix Chamber of Commerce, the Tucson Hispanic Chamber of
Commerce, the Greater Flagstaff Chamber of Commerce, the Arizona
Restaurant Association, the Yuma County Chamber of Commerce, Marc
Community Resources, Inc., the Arizona Free Enterprise Club, and ABRIO
Family Services and Supports, Inc.; Timothy A. La Sota, Timothy A. La Sota,
PLC, Phoenix, Attorneys for Arizona Licensed Beverage Association

Mark Brnovich, Arizona Attorney General, Dominic E. Draye, Solicitor
General, Charles A. Grube (argued), Senior Agency Counsel, Phoenix,
Attorneys for State of Arizona

Stephen W. Tully, Hinshaw & Culbertson LLP, Phoenix, Attorneys for
Industrial Commission of Arizona, Arizona Department of Administration,
and Craig C. Brown

Logan T. Johnston, Johnston Law Offices, P.L.C., Phoenix, Attorneys for
Arizona Health Care Cost Containment System and Thomas J. Betlach

Israel G. Torres, James E. Barton II (argued), Saman Golestan, Torres Law
Group, PLLC, Tempe, Attorneys for Arizonans for Fair Wages and Healthy
Families Supporting Prop 206

William G. Montgomery, Maricopa County Attorney, Joseph I. Vigil,
Joseph Branco, Deputy County Attorneys, Civil Services Division, Phoenix,
Attorneys for Amicus Curiae Maricopa County

Brian M. Bergin, Bergin, Frakes, Smalley & Oberholtzer, PLLC, Phoenix, Attorneys for Amici; Michael T. Liburdi, Kathryn Hackett King, General Counsel to Governor Douglas A. Ducey, Phoenix, Attorneys for Amicus Curiae Governor Douglas A. Ducey and Office of Strategic Planning & Budgeting; Josh Kredit, Arizona House of Representatives, Phoenix, Attorney for Amicus Curiae House Speaker J.D. Mesnard; and Greg Jernigan, Jeff Kros, Arizona State Senate, Phoenix, Attorneys for Amicus Curiae Senate President Steve Yarbrough

Rhonda L. Barnes and Jay Tomkus, Arizona House of Representatives, Phoenix; and Lisette Flores, Arizona State Senate, Phoenix, Attorneys for Amici Curiae Senate Minority Leader Katie Hobbs and House Minority Leader Rebecca Rios

Stanley Lubin, Lubin & Enoch, P.C., Phoenix, Attorneys for Amici Curiae National Employment Law Project and A Better Balance

Jonathan Riches, Scharf–Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix, Attorneys for Amicus Curiae Goldwater Institute

David Wells, Mesa, for Amicus Curiae David Wells, Ph.D., citizen resident of Arizona

John R. Dacey, Christopher L. Hering, Gammage & Burnham, P.L.C., Phoenix, Attorneys for Amicus Curiae Arizona Association of Providers for Persons with Disabilities

Jean–Jacques Cabou, Perkins Coie LLP, Phoenix, Attorneys for Amicus Curiae Living United For Change In Arizona

JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE PELANDER, and JUSTICES BRUTINEL, BOLICK, GOULD, and LOPEZ joined.

JUSTICE TIMMER, opinion of the Court:

¶1 The Arizona electorate approved Proposition 206, "The Fair Wages and Healthy Families Act," in the November 2016 election, thereby increasing the minimum wage and establishing earned paid sick leave. Petitioners ask us to declare that Proposition 206 violates the Arizona Constitution's Revenue Source Rule, Separate Amendment Rule, and Single Subject Rule. We decline to do so, holding instead that Proposition 206 does not violate these provisions.

## BACKGROUND

¶2 The Arizona Constitution, article 4, part 1, section 1(2), empowers qualified electors to propose by initiative laws for the voters' approval. Proposition 206 is one such initiative. Upon voter approval, Proposition 206 was codified as A.R.S. §§ 23–363 and 23–371 to –381. It increases Arizona's minimum wage incrementally over a three–year period and then requires annual increases tied to the consumer price index. A.R.S. § 23–363. It also requires employers to provide mandatory sick leave of one hour for every thirty hours worked. *Id.* §§ 23–372 to –373. The State of Arizona, the United States, and certain small businesses are exempt from Proposition 206's requirements. *See* A.R.S. § 23–362(B). The Proposition's minimum wage provisions went into effect on January 1, 2017, and the sick leave provisions went into effect on July 1, 2017.

¶3 Petitioners filed suit seeking a declaration that Proposition 206 violates the Revenue Source Rule (Ariz. Const. art. 9, § 23), the Separate Amendment Rule (Ariz. Const. art. 21, § 1), and the Single Subject Rule (Ariz. Const. art. 4, pt. 2, § 13). They also sought to preliminarily enjoin implementation and enforcement of the Proposition. After the superior court denied a preliminary injunction, Petitioners sought special action relief with this Court.

¶4 We previously accepted jurisdiction of the petition for special action, rejected Petitioners' constitutional challenges, and denied relief noting a written opinion explaining our decision would follow. This Court has jurisdiction pursuant to article 6, section (5), of the Arizona Constitution.

## DISCUSSION

### I.    The Revenue Source Rule

¶5        The Revenue Source Rule was referred to voters by the legislature and passed in the November 2004 election.  Ariz. Const. art. 9, § 23, Historical and Statutory Notes.  It provides:

> **A.** An initiative or referendum measure that proposes a mandatory expenditure of state revenues for any purpose, establishes a fund for any specific purpose or allocates funding for any specific purpose must also provide for an increased source of revenues sufficient to cover the entire immediate and future costs of the proposal. The increased revenues may not be derived from the state general fund or reduce or cause a reduction in general fund revenues.

> **B.** If the identified revenue source provided pursuant to subsection A in any fiscal year fails to fund the entire mandated expenditure for that fiscal year, the legislature may reduce the expenditure of state revenues for that purpose in that fiscal year to the amount of funding supplied by the identified revenue source.

Ariz. Const. art. 9, § 23.  Any challenge to an initiative or referendum under the Revenue Source Rule must be made after the measure passes. *League of Ariz. Cities & Towns v. Brewer*, 213 Ariz. 557, 562 ¶ 25 (2006).

¶6        Proposition 206 does not explicitly propose a mandatory expenditure of state revenues, establish a fund, or allocate funding.  And because Proposition 206 does not apply to state employees, the state's payroll is unaffected.  Petitioners, the Arizona Chamber of Commerce & Industry and others, nevertheless assert that Proposition 206 "proposes a mandatory expenditure of state revenues" as contemplated by the Revenue Source Rule because (1) the Industrial Commission of Arizona ("ICA") is required to implement the sick leave provisions, and (2) other state agencies will be forced to increase their expenditures to third parties "[t]o comply with federal law, contract provisions, and reality."  Petitioners argue that

Proposition 206 does not provide an independent revenue source to cover these costs, and the measure therefore violates the Revenue Source Rule.

¶7     Real–parties–in–interest, the State and intervenor Arizonans for Fair Wages and Healthy Families Supporting Prop 206, counter that the Revenue Source Rule applies only to initiatives and referendums that directly require expenditures and does not apply when such measures merely cause revenue expenditures or require state agencies to act. They contend that Proposition 206 does not explicitly require a mandatory expenditure of state revenues and therefore complies with the Revenue Source Rule.

## A.  Meaning of the Revenue Source Rule

¶8     Resolution of this dispute turns initially on the meaning of "propos[ing] a mandatory expenditure of state revenues" as used in the Revenue Source Rule, § 23(A). Before deciding this issue, we address real–parties–in–interest's argument, adopted by the superior court, that even if Proposition 206 violates § 23(A), the provision remains valid because § 23(B) would relieve the state from expending revenues to fund the measure. We disagree. By its terms, § 23(B) is triggered only when an "identified revenue source [is] provided pursuant to subsection A." If that revenue source fails to fully fund a mandated expenditure for a fiscal year, the legislature may reduce funding in the amount equal to the shortfall. Section 23(B) does not apply, however, if § 23(A) requires an independent funding source and one is not provided. In that case, the initiative or referendum would be rendered unconstitutional as a whole unless valid parts of the measure could be upheld under the severability doctrine. *See Randolph v. Groscost*, 195 Ariz. 423, 427 ¶ 13 (1999) (discussing the severability doctrine).

¶9     We construe § 23(A) "to ascertain and give effect to the intent and purpose of the framers and the people who adopted it." *Brewer v. Burns*, 222 Ariz. 234, 239 ¶ 26 (2009) (citation and internal quotation marks omitted). To do so, we give the words used "their natural, obvious and ordinary meaning" unless the context suggests otherwise. *Id.* We apply the provision as written if it is subject to only one reasonable meaning. *See Ariz. Early Childhood Dev. & Health Bd. v. Brewer*, 221 Ariz. 467, 470 ¶ 10 (2009). But if the provision is unclear, "we can consider the history behind the

provision, the purpose sought to be accomplished by its enactment, and the evil sought to be remedied." *Cain v. Horne*, 220 Ariz. 77, 80 ¶ 10 (2009) (citation and internal quotation marks omitted).

**¶10**        We conclude that "propos[ing] a mandatory expenditure of state revenues" occurs whenever an initiative or referendum explicitly requires either an expenditure of state revenues or state actions that themselves inherently require expenditure of state revenues. A mandatory expenditure of state revenues does not occur if an initiative or referendum only indirectly *causes* an expenditure of state revenues.

**¶11**        First, § 23(A) by its terms provides that the Revenue Source Rule applies whenever the initiative or referendum itself affirmatively requires an expenditure of state revenues. *Cf. Farris v. Advantage Capital Corp.*, 217 Ariz. 1, 2 ¶ 5 (2007) (stating that courts look first to statutory text as the best indicator of intent). Specifically, the Rule calls for an independent funding source whenever an initiative or referendum "propose[s]" a mandatory expenditure of state revenues, "establishes" a fund, or "allocates" funding. Nothing in § 23(A) suggests that the Rule applies whenever the initiative or referendum merely causes increased state spending. *Cf. League of Ariz. Cities & Towns*, 213 Ariz. at 562 ¶ 26 (stating in dicta that the initiative at issue likely does not violate the Revenue Source Rule because "[a]ny expenditure of state general funds . . . depends on the legislature's actions" rather than a mandate of the initiative). Tellingly, § 23(A) addresses "cause" only in the context of addressing a sufficient independent funding source, which suggests that the referring legislature and voters intended "mandatory expenditure" and "cause" to mean different things. *See* Ariz. Const. art. 9, § 23(A) (providing that if an independent funding source is required, it "may not . . . cause a reduction in general fund revenues").

**¶12**        Second, even if we assume § 23(A) is ambiguous, interpreting the Revenue Source Rule as applying whenever an initiative or referendum indirectly causes an expenditure of state revenues would severely hamper the initiative process. *Cf. Ariz. Early Childhood Dev. & Health Bd.*, 221 Ariz. at 470 ¶ 10 (stating that when an initiative–created statute is ambiguous, courts may consider the consequences and effects of alternate constructions). It is implausible that qualified electors who seek to propose

an initiative measure could successfully scour the state's innumerable dealings to anticipate and provide a funding source for any conceivable expenditures of state revenues that a ballot measure might indirectly cause. For example, electors would have to account for the costs to train affected employees, contract for goods and services, or even to publish the new law itself. Our construction of § 23(A) avoids this cumbersome consequence and preserves an initiative and referendum practice that has been a tool of direct democracy for more than a century. *Cf. Whitman v. Moore*, 59 Ariz. 211, 218 (1942), *overruled, in part, on other grounds by Renck v. Superior Court*, 66 Ariz. 320, 327 (1947) (stating that whether to include initiative and referendum in our constitution "was a burning issue" at statehood and both the delegates and the voters considered its inclusion "among the most important" provisions).

**¶13** We reject, however, the real–parties–in–interest's assertion that the Revenue Source Rule, § 23(A) applies only when an initiative or referendum explicitly directs an expenditure of state revenues and not when it directs state action that itself inherently requires such an expenditure. If we were to adopt this construction, the Rule could be easily circumvented. For example, rather than directing the legislature to spend one million dollars to establish a new agency, an initiative could simply direct the legislature to establish the agency. This would result in the type of unfunded mandate the Revenue Source Rule sought to remedy. *Cf. Smith v. Ariz. Citizens Clean Elections Comm'n*, 212 Ariz. 407, 410 ¶ 6 (2006) ("We construe constitutional provisions in light of the purpose of the enactment and the evil sought to be remedied." (citation and internal quotation marks omitted)). Thus, fairly read, the Revenue Source Rule also applies whenever an initiative or referendum expressly requires state action that inherently requires a non–discretionary expenditure of state revenues.

**¶14** Our view aligns with the Nevada Supreme Court's interpretation of its corollary to the Revenue Source Rule. *See Herbst Gaming, Inc. v. Heller*, 141 P.3d 1224 (Nev. 2006). The *Herbst* court held that an initiative that expanded a statutory list of public places in which smoking is banned did not "require the expenditure of money" merely because the measure would increase enforcement costs. *Id.* at 1232–33. Because the measure "[did] not, for example, compel an increase or reallocation of police officers to enforce its provisions," but left enforcement

mechanics and budgeting discretion entirely with government officials, the court was persuaded that a revenue–generating provision was not required. *Id.* at 1233; *cf. State ex. rel. Card v. Kaufman,* 517 S.W.2d 78, 79–80 (Mo. 1974) (holding that a proposed initiative to require University City to pay its firefighters salaries equal to that paid by St. Louis deprived University City officials of budgeting discretion and was therefore "an appropriation" that violated Missouri's version of the Revenue Source Rule).

¶15        We next turn to the parties' arguments concerning Proposition 206. We review the constitutionality of Proposition 206 de novo. *See In re Leon G.*, 204 Ariz. 15, 19 ¶ 9 (2002). We also presume it complies with the Revenue Source Rule. *Cf. Gallardo v. State*, 236 Ariz. 84, 87-88 ¶ 9 (2014) (discussing presumption of constitutionality generally afforded to legislative enactments).

### B. The ICA

¶16        Proposition 206 authorizes the ICA to "coordinate implementation and enforcement" of earned paid sick time and requires the ICA to "promulgate appropriate guidelines or regulations for such purposes." A.R.S. § 23–376. The Proposition also provides that the ICA "shall create and make available to employers . . . model notices" for employers' use in providing written notice to employees about Proposition 206's earned paid sick time provisions. *Id.* § 23–375(D).

¶17        We agree with Petitioners that the provisions requiring the ICA to promulgate guidelines or regulations and to create model notices constitute a "mandatory expenditure of state revenues," as contemplated by the Revenue Source Rule, § 23(A). The ICA has no discretion to ignore these provisions or to refuse to allocate state revenues to accomplish the required tasks. And, unlike the case in *Herbst*, Proposition 206 does not merely expand application of an existing ICA program but requires the ICA to take specific actions to implement new earned paid sick leave provisions. The Revenue Source Rule, § 23(A) therefore requires that Proposition 206 provide an independent funding source for these tasks.

¶18         Proposition 206 provides a funding source for the ICA tasks by amending A.R.S. § 23–364(G) to permit the imposition of civil penalties on employers that fail to pay earned sick time to employees.  Section 23–364(G) also provides that "[c]ivil penalties shall be retained by the agency that recovered them and used to finance activities to enforce this article," which includes the earned paid sick time provisions.  *See also* A.R.S. § 23–364(A) ("For purposes of this section . . . 'article' shall mean both article 8 [minimum wage] and article 8.1 [earned paid sick time] of this chapter.").  Enforcement of the earned paid sick time provisions embraces the ICA's mandate to issue guidelines or regulations and to provide model notices to employers.  Section 23–376 plainly states that the guidelines and regulations are to be used to implement *and enforce* the sick time provisions.  And providing model notices promotes enforcement by educating employers and employees about their respective obligations and rights under the statute.

¶19         Petitioners assert that § 23–364(G)'s fine provisions are insufficient to fund the ICA mandate because the ICA must act before any fines can be collected.  But any insufficiency would not invalidate Proposition 206 or the ICA mandate.  The Revenue Source Rule, § 23(B) provides the remedy when a revenue source is provided but proves insufficient:  the legislature can reduce the expenditure of state revenues used for creating the ICA guidelines, regulations, or model notices in a fiscal year to the amount of funding supplied by the fines.

¶20         In sum, Proposition 206 complies with the Revenue Source Rule, § 23(A) by providing a revenue source to fund the ICA's mandate to implement and enforce the earned paid sick time provisions.  If the fines collected to fund the ICA mandate are insufficient, § 23(B) would apply to relieve the state from funding the shortfall.

### C.  Other state agencies

¶21         Petitioners next argue that Proposition 206 "mandat[es] expenditure of state revenues" without providing an independent funding source in violation of the Revenue Source Rule, § 23(A), because the minimum wage and earned paid sick time provisions caused the Arizona Health Care Cost Containment System ("AHCCCS"), the state Medicaid

program, to raise the payment rates for nursing facilities and home and community based service providers.

**¶22**    After Proposition 206 passed, several providers informed AHCCCS they would have to curtail services or terminate their contracts unless AHCCCS raised its rates. These providers were already under financial stress due to increased costs caused by federal mandates and rate reductions AHCCCS had made during the economic downturn. For all these reasons, AHCCCS chose to raise certain rates effective January 2017 to ensure it maintained a sufficiently robust provider pool, as required by the Medicaid Act. *See* 42 U.S.C. § 1396a(a)(30)(A) (requiring state plans for medical assistance to make provider payments that "are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area"); A.R.S. § 36–2903(M) (stating that provider contracts must contain terms "as necessary . . . to ensure adequate performance and compliance with all applicable federal laws"). According to AHCCCS, nothing, including Proposition 206, required it to increase rates merely because a provider's labor costs increased.

**¶23**    Petitioners similarly argue that Proposition 206 requires the expenditure of state revenues because the state may be required to cover increased labor costs for contractors that provide goods and services. Petitioners do not point to any contract requiring the state to increase payments under existing contracts. Nevertheless, they assert that, "if there is even one cost–reimbursement contract that requires the State to automatically pay a contactor the minimum wages of the contractor's employees due to the enactment of the Proposition, the expenditure violates the Revenue Source Rule and the Proposition is unconstitutional."

**¶24**    Proposition 206 will likely impact the state's coffers, despite the state's exemption, due to its dealings with entities that are required to comply with the Proposition. (As real–parties in interest and some amici point out, the state may also gain tax revenues and perhaps other financial benefits from the increase in the minimum wage.) But Proposition 206 itself does not require the state to increase rates for AHCCCS providers or reimburse increased labor costs to other state contractors. And increasing

11

the minimum wage and providing earned paid sick time for non–state workers does not inherently require the state to expend revenues. Such expenditures of state revenues, even if prompted by Proposition 206, stem from the state's discretionary policies and spending decisions or third–party contracts. Proposition 206 does not require these expenditures, and therefore the Revenue Source Rule, § 23(A) does not apply.

¶25 The flaw in interpreting the Revenue Source Rule as applying whenever an initiative or referendum indirectly causes an expenditure of state revenues is highlighted by considering the consequences if Proposition 206 had provided an independent funding source to cover any expenditures of state revenues due to increasing wages and benefits for non–state workers. If that source was insufficient, the Revenue Source Rule, § 23(B) would have been triggered to avoid the consequences of a partially unfunded mandate—the increase in the minimum wage and the provision of earned paid sick time. But unlike applying § 23(B) to reduce funding to relieve the ICA from promulgating guidelines, regulations, and model notices, § 23(B) could not relieve the state from paying the increased wages and benefits required by Proposition 206 because the state does not pay wages and benefits to non-state workers. And even if § 23(B) authorized the state to reduce payments to AHCCCS providers and other state contractors, the minimum wage increase and earned paid sick time benefit for non–state workers—the subject of Proposition 206's mandate—would be unaffected. The remedial provisions of § 23(B) only make sense when applied to mandated direct state expenditures rather than to indirectly caused expenditures. Section 23(B)'s inapplicability shows that the Revenue Source Rule was not intended to require an initiative or referendum to provide a dedicated funding source for costs indirectly caused but not required by a measure.

¶26 In sum, Proposition 206's minimum wage increase and the provision of earned paid sick time for certain non–state workers does not constitute a "mandatory expenditure of state revenues." The Revenue Source Rule, § 23(A) does not apply.

## II. The Separate Amendment Rule

¶27 The Separate Amendment Rule provides:

> Any amendment or amendments to this Constitution may be proposed in either House of the Legislature, or by Initiative Petition . . . .  If more than one proposed amendment shall be submitted at any election, such proposed amendments shall be submitted in such manner that the electors may vote for or against such proposed amendments separately.

Ariz. Const. art. 21, § 1.  The provision was "intended to prevent the pernicious practice of 'log–rolling'" which bundles separate and distinct propositions into one proposed amendment so that voters favoring one proposition must vote for all.  *Kerby v. Luhrs*, 44 Ariz. 208, 214–15 (1934); *see also Ariz. Together v. Brewer*, 214 Ariz. 118, 120 ¶ 3 (2007) (stating that the Separate Amendment Rule ensures that voters are permitted "to express their separate opinion as to each proposed constitutional amendment" (citation and internal quotation marks omitted)).

¶28	Petitioners argue that Proposition 206 violates the Separate Amendment Rule by addressing two separate topics:  minimum wage and earned paid sick time.  We disagree.  By its plain terms, the Separate Amendment Rule only applies to proposed constitutional amendments, whereas Proposition 206 proposed statutory changes.  *Cf. Jett v. City of Tucson*, 180 Ariz. 115, 119 (1994) (concluding that when the language of a constitutional provision is clear and unambiguous, "we generally must follow the text of the provision as written").

¶29	Petitioners nevertheless ask us to extend application of the Separate Amendment Rule to initiatives because the Voter Protection Act "put[s] statutory initiatives on par with constitutional ones" by limiting the legislature's authority to modify laws enacted by voters.  *See* Ariz. Const. art. 4, pt. 1, § 1(6).  But erecting barriers to changing initiative–created laws does not embed those laws in our constitution.  The Separate Amendment Rule does not apply.

### III.  The Single Subject Rule

¶30	The Single Subject Rule provides:

> Every act shall embrace but one subject and matters properly
> connected therewith, which subject shall be expressed in the
> title; but if any subject shall be embraced in an act which shall
> not be expressed in the title, such act shall be void only as to
> so much thereof as shall not be embraced in the title.

Ariz. Const. art. 4, pt. 2, § 13. Like the Separate Amendment Rule applicable to proposed constitutional amendments, the Single Subject Rule was intended to prevent "log-rolling" by sparing an individual legislator from having to vote for a disfavored proposition to secure enactment of a favored one. *See Bennett v. Napolitano*, 206 Ariz. 520, 528 ¶ 37 (2003). Similarly, the provision frees the governor from having to veto an entire bill, including provisions he approves, to prevent disfavored provisions from becoming law. *See id.* ¶ 38 ("A governor presented with a multi–subject bill inevitably faces a 'Hobson's choice.'").

**¶31** This Court has long recognized that the Single Subject Rule applies only to acts by the legislature; it does not apply to initiatives. *See Citizens Clean Elections Comm'n v. Myers*, 196 Ariz. 516, 525 ¶ 36 (2000); *Iman v. Bolin*, 98 Ariz. 358, 365 (1965); *Barth v. White*, 40 Ariz. 548, 555-56 (1932). Initiative petitions are governed by the Arizona Constitution, article 4, part 1, § 1, which, as relevant here, requires only that a proposed measure have some title and some text. *See* Ariz. Const. art. 4, pt. 1, § 1(9); *Iman*, 98 Ariz. at 365; *Barth*, 40 Ariz. at 556.

**¶32** Petitioners ask us to reconsider our prior decisions. They point out that *Barth*, the genesis for the line of precedent, involved an initiative–proposed constitutional amendment, and other states now favor applying provisions similar to the Single Subject Rule to such initiatives. We decline to revisit our decisions.

**¶33** The *Barth* line of cases did not turn on the substance of the initiatives at issue. Indeed, the initiative measures at issue in *Citizens Clean Elections Commission* and *Iman* proposed statutory amendments, not constitutional amendments. *See Citizens Clean Elections Comm'n*, 196 Ariz. at 518 ¶ 2; *Iman*, 98 Ariz. at 362. This Court's prior decisions are further supported by the Single Subject Rule's language and placement within the constitution. The Rule applies to "act[s]," which are enacted by the

14

legislature, and does not address initiative or referendum petitions. *Cf. Barth*, 40 Ariz. at 556 (recognizing that an initiative petition is not an "act"). And the Single Subject Rule is set forth in article 4, part 2 of the constitution, which addresses "The Legislature."

¶**34**        The Single Subject Rule does not apply.

## CONCLUSION

¶**35**        We grant review of this special action petition but deny relief. Proposition 206 does not violate the identified provisions in the Arizona Constitution.